Gants, J.
This motion for summary judgment may be understood only in the context of its extensive background. The defendant Globe Newspaper Company, Inc. (“the Globe”) publishes a print newspaper, The Boston Globe (“the Globe newspaper”), and an Internet web site, Boston.com, where its newspaper articles and photographs are available on-line. The Globe also transfers or sublicenses the use of certain newspaper articles and photographs to other online media, such as Mead Data Central Corp.’s NEXIS database (“online databases”), where they are republished under the Globe’s name.
The plaintiffs — William Marx, Greg Mironchuk, Michael Quan, Carl Walsh, Linda Weltner, and Cate McQuaid (collectively, “the plaintiffs” or “the plaintiff freelancers”) — are writers and photographers who were freelance contributors to the Globe. For many years, the plaintiffs’ relationship with the Globe was governed by an oral agreement in which the plaintiffs, as freelance independent contractors, either regularly or episodically sold their work for a fee to the Globe for publication in the Globe newspaper. Under this oral agreement, the freelancers retained the copyright in their work and did not expressly grant the Globe any license to republish their work in any media other than the Globe newspaper.
In or about December 1996, the Globe decided that it wished to provide articles written by its freelance authors to Boston.com and other online databases. To obtain the freelancers’ consent to this republication, the Globe sent its freelancers a short proposed agreement that read in its entirety:
From time to time you will write articles at our request for The Boston Globe. You agree that your articles will be “works made for hire” for copyright purposes. Consequently The Boston Globe shall own all rights, including copyright, in your articles and may reuse them with no additional payment being made to you.
While the Globe asked its freelancers to sign this agreement, it did not condition the receipt of future assignments on its execution. Rather, it allowed its assigning editors to continue to use a freelancer that refused to sign if the assigning editor believed the freelancer to be valuable. Consequently, most freelancers, including the plaintiffs, did not sign this proposed agreement. The Globe did not republish a freelancer’s work in Boston.com or redistribute the work to other online databases if the freelancer had refused to sign the proposed “works made for hire” agreement.
In 1997, in the United States District Court for the - Southern District of New York, a group of freelancers who wrote for other newspaper and magazine publishers, including the Globe’s parent company, The New York Times Company, filed suit against these publishers alleging that they were infringing upon the freelancers’ copyright by republishing their work in *401 online databases without their consent. Tasini v. The New York Times Company, Inc. (“Tasini’), 972 F.Sup. 804 (S.D.N.Y. 1997), reversed, 206 F.3d 161 (2d Cir. 1999), affirmed, 533 U.S. 483 (2001). In Tasini, the defendant publishers contended that they were copyright owners of “collective works,” i.e. their newspapers and magazines, and were privileged under 17 U.S.C. §201(c) of the Copyright Act to republish and redistribute the freelance authors’ specific works in various online databases without their consent as “revisions” of the publishers’ “collective works.” Tasini, 533 U.S. at 488. On August 17, 1997, the United States District Court agreed with the publishers’ position and granted them summary judgment. Tasini, 972 F.Sup. 804 (S.D.N.Y. 1997). After the District Court’s decision in Tasini (and, no doubt, as a result of that decision), the Globe changed its policy and began to republish and redistribute freelance work to Boston.com and other online databases without the freelancers’ consent.
On September 24, 1999, however, the United States Court of Appeals for the Second Circuit reversed the grant of summary judgment in Tasini. 206 F.3d 161 (2d Cir. 1999). The Second Circuit held that the defendant publishers were not privileged to republish the work of their freelancers as “revisions” of the publishers’ “collective works” under the Copyright Act, and that any such republication without consent constituted an infringement of the freelancers’ copyright. Id. Just as the District Court’s decision in Tasini triggered a change in policy at the Globe, so, too, did the Second Circuit’s reversal of that decision.
In the wake of the Second Circuit’s decision in Tasini, the Globe revisited whether it should require its freelancers to execute an agreement governing the republication of the freelance work they furnished to the Globe and ultimately decided to require all its freelancers to execute a new written License Agreement. On April 4, 2000, the Globe posted the License Agreement on its website, together with an explanatory letter from its then-Managing Editor Louisa Williams, and sent copies of the proposed Agreement and the explanatory letter to those freelancers it viewed as frequent contributors to the Globe, including the plaintiffs.
Under the proposed License Agreement, the freelancers, in return for payment for their work, agree to grant the Globe:
1. the exclusive right to first publish the work in the Globe newspaper;
2. “the non-exclusive, fully-paid up, worldwide license to use the accepted Work” for the entire term of the copyright; and
3. for no additional fee, “a non-exclusive, fully-paid up, worldwide license to use all of the Works that The Globe has previously accepted from [the freelancer], if any.”
License Agreement at ¶2. The non-exclusive license granted to the Globe “includes the right to publish the Works; to create derivative works; to use, adapt, modify, perform, transmit or reproduce such material and derivatives in any form or medium whether now or hereafter known throughout the world including, without limitation, compilations, microfilm, library databases, videotext, computer databases, CD-ROMS, and the Internet. . .” provided the Globe’s use, transfer, or sublicense of the Work is limited to inclusion of the Work in works marketed or grouped under the Globe’s name. Id.
The explanatory letter that accompanied this License Agreement informed the Globe’s freelancers that, by signing this Agreement, they were granting the Globe:
1. the right to print their work first, with exclusive rights to print publication for two days within eastern Massachusetts and southern New Hampshire,[1] and
2. “The right to put the work on boston.com, in The Globe’s archives, in commercial databases that carry The Globe and in any media or package that has the Globe’s ‘brand’ now and in the future, with no extra payment to [the freelancer]."
The explanatory letter also told the freelancers that, apart from this, they were retaining their copyright of the work, and had the right to resell their work in print form or to any other media on the second day after publication.[2] The explanatory letter added, “Starting July 1, 2000, we will not accept work by anyone who has not signed this agreement.”
In essence, the License Agreement, viewed with the accompanying explanatory letter, gave each Globe freelancer an ultimatum: either sign a new written License Agreement which, among other provisions, granted to the Globe for no additional fee a non-exclusive license to use “all of the Works that The Globe has previously accepted from [the freelancer]” in Boston.com or any other online database that is marketed or grouped under the Globe’s name, or, effective July 1, 2000, the Globe will not accept any additional work from the freelancer. This ultimatum left the freelancers with an unpleasant choice: either surrender, for past and future works purchased by the Globe, the copyright victory they had vicariously obtained from the Second Circuit in Tasini and continue to have the opportunity to sell their freelance work to the Globe, or preserve the fruits of that victory and lose the ability to sell their work to the Globe.
Five of the plaintiffs — William Marx, Greg Mironchuck, Michael Quan, Carl Walsh, and Linda Weltner — have refused to execute the proposed License Agreement and, as a result, can no longer sell their freelance work to The Globe. The sixth plaintiff— Cate McQuaid — executed the License Agreement just *402 before the July 1, 2000 deadline but claims that she did so under duress.
The plaintiffs, in their First Amended Complaint (“Complaint”), allege that the Globe has committed an unfair or deceptive act or practice in violation of G.L.c. 93A, § 11 by making this ultimatum. In addition, the plaintiffs allege that the Globe violated G.L.c. 93A, § 11 through misrepresentations contained in the April 4, 2000 explanatory letter from Managing Editor Williams and another e-mail, dated April 24, 2000 from Dan Zedek, its Editorial Design Director, which, although purporting to resolve “the misunderstandings this contract has caused . . . and make [The Globe’s] intent clearer,” actually misrepresented the terms of the proposed License Agreement.
The Globe earlier moved to dismiss the complaint for failure to state a claim under Mass.R.Civ.P. 12(b)(6). On January 11, 2001, this Court denied that motion, finding that the Globe had not met its formidable burden of showing beyond a doubt that the plaintiffs could prove no set of facts in support of their claim that would entitle them to relief. Memorandum of Decision and Order on Defendant’s Motion to Dismiss at 13, 13 Mass. L. Rptr. 190, citing Nader v. Citron, 372 Mass. 372 Mass. 96, 98 (1977), and Coughlin v. Department of Correction, 43 Mass.App.Ct. 809, 815-17 (1997) (lack of discovery places court in “unfortunately abstract posture” in considering motion to dismiss).
The Globe now moves for summary judgment. In contrast with a motion to dismiss, where the Court must accept as true the factual allegations of the complaint and all reasonable inferences favorable to the plaintiffs which can be drawn from those allegations, the Court on summary judgment must rely solely on the evidentiary record and, viewing that evidence in the light most favorable to the plaintiffs, determine whether they have any reasonable expectation of proving the essential elements of their G.L.c. 93A claim. Compare Fairneny v. Savogran, 422 Mass. 469, 470 (1996), with Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). After hearing, applying this standard, the Globe’s motion for summary judgment is ALLOWED.
DISCUSSION
In evaluating the Globe’s motion for summary judgment, it is important initially to separate out what the plaintiffs do not claim and do not dispute. First, the plaintiffs do not dispute that they are independent contractors who may be terminated at will by the Globe. The plaintiffs concede that the Globe would have acted lawfully if they had simply informed the plaintiffs that the Globe no longer wished to publish their work. See PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975) (mere refusal to deal, without more, does not constitute an unfair trade practice under G.L.c. 93A).
Second, the plaintiffs also do not dispute that the Globe would have acted lawfully if they had given the plaintiffs an ultimatum that the Globe would continue to publish their work only if they executed a License Agreement that granted certain licensing rights to the Globe with respect to work provided to the Globe during the life of that Agreement. While the plaintiffs do not like the terms of the proposed License Agreement with respect to future work because it requires freelancers to grant the Globe a non-exclusive license to publish their work in any media, including online databases, provided the work is “marketed and/or grouped under The Globe’s name or brand,” they acknowledge that the Globe is entitled to impose that condition. The crux of their claim is that the Globe lawfully may only set these conditions with respect to work provided to the Globe after execution of the License Agreement, and may not require them to relinquish their licensing rights with respect to work provided to the Globe before execution of this Agreement.
G.L.c. 93A, §2(a) makes unlawful any “[u]nfair or deceptive acts or practices in the conduct of any trade or commerce.” G.L.c. 93A, §2(a). The Supreme Judicial Court has stated “that the following are ‘considerations to be used in determining whether a practice is to be deemed unfair: (1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) . . . is immoral, unethical, oppressive, or unscrupulous; (3) . . . causes substantial injury [to] . . . competitors or other businessmen.’ ” Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986), quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), quoting 29 Fed. Reg. 8325, 8355 (1964).
This Court shall consider two distinct theories by which the Globe’s relevant conduct — requiring freelancers to relinquish much of their copyright as to work already published by the Globe as a condition of a continued freelance relationship with the Globe— may potentially be deemed an unfair or deceptive act or practice in violation of G.L.c. 93A, §2(a).
1. Violation of the Implied Covenant of Good Faith and Fair Dealing
“Every contract implies good faith and fair dealing between the parties to it.” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471 (1991), quoting Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n. 9 (1990), and Kerrigan v. Boston, 361 Mass. 24, 33 (1972). “The implied covenant of good faith and fair dealing provides ‘that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. . .’ ” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. at 471, quoting Drucker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385(1976), and Uproar Co. v. National Broadcasting Co., 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670 (1936). *403 Since a breach of the implied covenant of good faith and fair dealing means that the defendant has acted in bad faith or engaged in unfair dealing, a breach of this implied covenant in a commercial context would be sufficient to support a finding of violation of G.L.c. 93A. See Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. at 474 (“conduct ‘in disregard of known contractual arrangements’ and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes,” quoting Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 857 (1986)). See also Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995) (finding that a breach of the implied covenant of good faith and fair dealing may constitute an unfair or deceptive practice for purposes of c. 93A); Cherick Distributors, Inc. v. Polar Corp., 41 Mass.App.Ct. 125, 128 (1996) (finding that “[t]he same evidence that supported the jury’s findings of a breach of the covenant of good faith and fair dealing . . . also supported the jury’s finding that Polar’s conduct amounted to an unfair or deceptive act under G.L.c. 93 A”).
To date, the appellate courts of Massachusetts have recognized two categories of relevant misconduct that breach the implied covenant of good faith and fair dealing. The first, found in Anthony’s Pier Four, Inc., occurs when a party to a contract knowingly violates an express term of the contract in order to obtain benefits beyond that agreed to in the contract from the other party. See Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. at 470, 473, and 474. In Anthony’s Pier Four, Inc., the Supreme Judicial Court affirmed a finding that Anthony Athanas violated both the express terms of the contract and the implied covenant of good faith and fair dealing by unreasonably withholding approval of the master plan for development of the Fan Pier in Boston in an attempt to pressure the developer, HBC Associates, “to sweeten the deal” HBC had previously entered into with Anthony’s. Id. at 470 and 473.
The second, first articulated in Fortune v. National Cash Register Co., 373 Mass. 96 (1977), does not require a violation of an express term of a contract but occurs whenever a principal acts in bad faith by attempting to deprive an agent of any portion of a commission due to him. Id. at 105. See also King v. Driscoll, 424 Mass. 1, 12 (1996). Fortune was employed by National Cash Register Co. ("NCR”) under a salesman’s contract that was terminable at will, without cause. Fortune at 97. Under the contract, Fortune was paid a weekly salary, plus commissions based on the amount of sales made within his sales territoiy. Id. As a result of a huge order of cash registers within his territoiy, Fortune became entitled to a substantial commission upon the shipment of those cash registers. Id. at 98-99. After the first shipment was made, Fortune was paid only 75 percent of the commissions due to him, and was thereafter terminated. Id. at 99-100. As a result of his termination, he was not paid either the remaining commissions due him on the cash registers already shipped or any additional commissions on the cash registers scheduled to be subsequently shipped. Id. at 99-100. The Supreme Judicial Court found that “under the express terms of the contract Fortune has received all the bonus commissions to which he is entitled.” Id. at 101. Despite finding that NCR had breached no express term of its contract with Fortune by terminating him and depriving him of the additional commissions that otherwise would be due, the Court held that NCR violated the implied covenant of good faith and fair dealing by terminating him for the purpose of paying Fortune “as little of the bonus credit as it could.” Id. at 101 and 105. The Supreme Judicial Court later extended this principle by holding that such conduct, even if not done for the purpose of depriving the agent of commissions, still violates the implied covenant of good faith and fair dealing if it results in the agent’s loss of compensation already earned. Gram v. Liberty Mat. Ins. Co., 384 Mass. 659, 672 (1981) (“Gram I”).
The instant case does not fall squarely within either of these two categories. Unlike in Anthony’s Pier Four, Inc., the Globe did not violate any provision of its oral agreement with the plaintiff freelancers by conditioning future retention on the freelancers’ partial surrender of their copyright in previously published work. Unlike in Fortune and its progeny, the plaintiff freelancers were not denied any commissions by the Globe’s conduct. By refusing to execute the License Agreement, they retained the ability to seek damages for the Globe’s copyright infringement under 17 U.S.C. §504.[3] Compare with Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 471 n. 1 (1992) (limiting cause of action alleging breach of implied covenant of good faith and fair dealing “to cases in which an employer fires an employee and thereby deprives him or her of bonuses, commissions, or wages”).
The key issue in this case, left open by this Court’s decision on the motion to dismiss, is whether the meaning of a breach of the implied covenant of good faith and fair dealing and, in turn, the scope of G.L.c. 93A should be enlarged to include the Globe’s threatened termination of a freelance relationship that was terminable at will in order to pressure the freelancers partially to relinquish the copyright they had been permitted to keep earlier in that relationship.
The Globe devotes most of its brief to the argument that it had no overarching, long-term contract with its freelancers and therefore could not have breached any implied covenant of good faith and fair dealing in such a contract. Rather, the Globe contends that each purchase of freelance work constituted a separate contract in which the Globe agreed to purchase a specific work for a specific price. The plaintiffs reply *404 that they had an overarching, indefinite term contract with the Globe that was implied-in-fact by “the conduct or relations of the parties.” Popponesset Beach Associates v. Marchillo, 39 Mass.App.Ct. 586, 592 (1996). In contrast with cases where the dispute focuses on whether the contract was for a fixed or indefinite duration, or whether one party is entitled to be paid for the services it rendered, this Court does not believe that choosing between these alternative legal characterizations of the relationship between the Globe and the plaintiff freelancers should be dispositive of this case. Indeed, as will be shown below, even if this Court were to accept the plaintiffs’ view that they had an indefinite implied-in-fact contract with the Globe subj ect to the implied covenant of good faith and fair dealing, they still cannot prevail in this litigation.
The fact of the matter is that, however one characterizes the relationship between the Globe and the plaintiff freelancers, its contours are not meaningfully in dispute. For all practical purposes, all parties agree that:
The freelancers were independent contractors whose relationship with the Globe was entirely at will. The Globe, for any reason, could decide that it no longer wished to publish the work of a freelancer, and a freelancer, for any reason, could decide that she no longer wished to publish her work in the Globe. Neither could claim a breach of contract from the termination by the other of their freelance relationship.
While at times a freelancer only occasionally published her work in the Globe, there were many instances when a freelancer was a regular contributor to the Globe — so regular that a loyal reader of the Globe reasonably would have assumed that she was a paid reporter, columnist, or photographer on the Globe staff.
While at times the freelancer and the Globe would discuss the length of a specific piece of work and its price, regular freelance contributors generally agreed with the Globe in advance as to the length and nature of their work and the price, and then delivered their work without the need for further discussion.
The Globe’s assigning editors had a core group of freelancers they would generally use, which included the plaintiffs, but could also assign work to less frequent contributors.
The Globe did not use on a regular basis any freelancer who regularly submitted work to the Boston Herald, its primary newspaper competitor.
The Globe is certainly correct that it never made any promise to any of the plaintiff freelancers as to the length of their relationship or even that they would have a long-term relationship. The Globe at any time could have told any freelancer that her work was no longer welcome, or that future work would be paid at a lower rate, or that future work would be accepted only if she surrendered, in whole or in part, her copyright on that work. In other words, the Globe’s relationship with its freelancers was more akin to dating than to marriage. The freelancers, however, are also correct that, for many, this was a long-term “dating” relationship, and that many understandings had accumulated during the course of that relationship that did not need to be repeated on every “date.”
In view of the contours of the freelance relationship, this Court is reluctant to expand the meaning of a breach of the implied covenant of good faith and fair dealing to include the Globe’s conduct here. In Anthony's Pier Four, Inc., Anthony Athanas wanted to terminate his agreement with the Fan Pier developer in order to obtain a higher price for his property, but the agreement was not terminable at will. Id at 458-61. Since he could not terminate the agreement and renegotiate its terms, he tried to pressure the developer to agree to negotiations by refusing in bad faith to approve the development plans. Id at 461-62. Here, whether one characterizes the freelance relationship as an overarching, indefinite term contract or a series of contracts governing each piece of freelance work, the relationship was certainly terminable and there was nothing that prevented the Globe from seeking to renegotiate its terms.
This Court would certainly be troubled if the Globe had sought to renegotiate the terms of its relationship with freelancers by demanding that the freelancers surrender the equivalent of wages or commissions. Since, as a matter of statute (G.L.c. 149, §148) and common law, an employer cannot refuse to pay wages and commissions that an employee has earned, and cannot attempt to deny the employee these commissions by terminating him, it is doubtful that an employer would be allowed to accomplish the same result by an agreement obtained through the threat of termination. The Globe, however, is not asking its freelancers to surrender the monies they were paid for their work or the equivalent of commissions; rather, it is asking them essentially to relinquish, in part, their copyright in work already published.
Pragmatically, the freelancers’ property right in the copyright they are being asked to relinquish has monetary value only if the freelancers were to bring an action for copyright infringement seeking damages under 17 U.S.C. §504. Through such an action, the freelancers could seek to obtain from the Globe the actual damages suffered by them as a result of the infringement or, alternatively, statutory damages as the court considers just of not less than $750 nor more than $30,000 for each infringement. 17 U.S.C. §504(b) and (c). For all practical purposes, then, the License Agreement’s relinquishment of licensing rights to previously published work is equivalent to a provision by which the freelancer, as a condition of continuing the freelance relationship, agrees not to bring a copyright *405 infringement action for the Globe’s republication and redistribution of prior work on Boston.com and other online databases after the District Court’s decision in Tasini in 1997.
In general, the law permits a corporation to insist, as a condition of entering into or continuing a contractual relationship with another party, that the party will not file suit against the corporation based on future negligence. See generally Sharon v. City of Newton, 437 Mass. 99, 105 (2002) (“A party may, by agreement, allocate risk and exempt itself from liability that it might subsequently incur as a result of its own negligence”). When a legal claim has arisen, in the absence of such a release or agreement not to sue, the law generally permits a corporation to insist, as a condition of entering into or continuing a contractual relationship with another party, that the party will not file suit against the corporation based on that claim. See generally King v. Driscoll, 418 Mass. at 583 (employee may be terminated for bringing or threatening suit that concerned “the internal administration, policy, functioning, and other matters of an organization”).
There are, however, certain circumstances, most based on statutory provisions but some on clearly established public policy, where the law bars an employer from terminating an employee or independent contractor because of her exercise of a protected right. See, e.g., G.L.c. 151B, §4(4) (barring retaliation against employee for bringing discrimination claim); Mello v. Stop & Shop Companies, Inc., 402 Mass. 555, 556-58 & n.2 (1988) (citing multiple Massachusetts statutes with provisions barring retaliation); King v. Driscoll, 418 Mass. at 582-83; Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 472 (1992). Thus, “(r)edress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers’ compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury).” Wright v. Shriners Hospital for Crippled Children, 412 Mass. at 472, quoting Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School, 404 Mass. 145, 149-50 (1989). Redress is also available “to an at-will employee who was discharged in retaliation for his cooperation with a law enforcement investigation concerning his employer.” Id., citing Flesner v. Technical Communications Corp., 410 Mass. 805, 811 (1991).
Where the law bars an employer from terminating an employee or independent contractor for her exercise of a protected right, the law must also bar an employer from threatening to fire the employee or independent contractor unless she were to agree not to bring a claim against the employer based on the violation of that protected right. For instance, if the Globe had discriminated against the plaintiffs on the basis of their race or gender, the Globe could not provide them with an ultimatum that their freelance relationship would be terminated unless they released the Globe from liability for discrimination or promised not to bring a discrimination claim. See G.L.c. 151B, §§4(4) and 4(4A); Tate v. Dept. of Mental Health, 419 Mass. 356, 364 (1995).
While courts have not characterized terminations of at-will employees contrary to public policy as violations of the covenant of good faith and fair dealing implicit in the employment relationship, it is not unfair to adopt such a characterization. Nor is it unfair, when the termination involves an independent contractor rather than an employee, to consider whether a termination constitutes an unfair act or practice under G.L.c. 93A when it violates a clearly established public policy.
The question of whether the Globe’s ultimatum constitutes an unfair act or practice in violation of G.L.c. 93A, then, depends on whether the Globe lawfully can terminate its relationship with a freelancer for bringing a claim of copyright infringement against the Globe based on a prior infringement. If the Globe cannot terminate the freelance relationship for bringing such a claim, then it cannot terminate the freelance relationship if the freelancer refuses to release such a claim. On the other hand, if the Globe could terminate its relationship with a freelancer for bringing a copyright infringement claim, then it could certainly require the freelancer to relinquish such a claim as a condition of continuing that freelance relationship.
In King v. Driscoll, the Supreme Judicial Court, in the employment context, reiterated that an at-will employee may be terminated for any reason unless the termination violates a clearly established public policy. 418 Mass. at 582. The Court observed that the public policy exception must be interpreted narrowly, lest the public policy exception swallow the at-will rule and “convert the general rule . . . into a rule that requires just cause to terminate an at-will employee.” Id., quoting Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 404 Mass. at 150. The Court held that “the internal administration, policy, functioning, and other matters of an organization cannot be the basis for a public policy exception to the general rule that at-will employees are terminable at any time . . . without cause.” Id. at 583. Rather, the public policy exception is intended to protect a public policy, not a private, internal policy of an organization. Id. Therefore, an employee may be fired for reporting internal problems to high-level officials in an organization, for disagreeing with his boss’s management of an organization, for reporting that store managers were making false damage claims to manufacturers, or for threatening to reveal an employer’s unfair and deceptive trade practices. Id. and cases cited.
Applying this distinction between the protection of public vs. private policy, the Supreme Judicial Court held that it did not violate public policy to terminate *406 an employee for participating in a shareholder’s derivative action. Id. The Court recognized that a Massachusetts statute, G.L.c. 156B, §46, conferred on the plaintiff the right to participate in a derivative suit. The Court, however, declared:
While we often look to statutes to find pronouncements of public policy, ... it is not necessarily true that the existence of a statute relating to a particular matter is by itself a pronouncement of public policy that will protect, in every instance, an employee from termination. Even a public policy, evidenced in a particular statute, which protects employees in some instances might not protect employees in all instances . . . The statute at issue may suggest a public policy in favor of allowing shareholders to seek redress for perceived harms to the corporation. This public policy, however, which relates to the financial well being of the corporation and, by extension, its shareholders, does not rise to the level of importance required to justify an exception to the general rule regarding termination of employees at will.
It may be true generally that the financial well being of a corporation affects the economy which in turn affects the well being of the citizenry, and that, therefore, shareholder derivative actions are appropriate and socially desirable conduct. Nevertheless, such a remote effect on the public, arising in the context of a conflict over internal policy matters, does not elevate King’s participation in the lawsuit to protected activity.
Id. at 583-84.
A federal statute, 17U.S.C. §504, certainly conferred on the plaintiff freelancers the right to bring a suit for copyright infringement and the existence of a statutory claim certainly reflects a public policy to allow redress to those whose copyrights have been infringed. Yet, as with shareholder derivative actions, this public policy relates more to the financial well being of the copyright holder and “does not rise to the level of importance required to justify an exception to the general rule regarding termination of employees at will.” See id. Indeed, the Supreme Judicial Court has observed:
To date, we have acknowledged very few statutory rights the exercise of which would warrant invocation of the public policy exception . . .For the exercise of a statutory right to be worthy of protection in this area we believe that the statutory right must relate to or arise from the employee’s status as an employee . . .
Id. at 584. The freelancers’ copyrights did not relate to or arise from their status as employees. In fact, they were never employees, only independent contractors, and their copyrights arose from work they performed as independent contractors. Therefore, this Court concludes that public policy does not prohibit the Globe from terminating a freelancer for bringing a copyright infringement claim and, therefore, does not prohibit the Globe from requiring a freelancer essentially to release any copyright claim as a condition of continuing the freelance relationship.
Nor, in contrast with the laws barring discrimination, is there any prohibition in the Copyright Act that prohibits retaliation against a copyright holder for bringing or threatening an infringement claim. Compare G.L.c. 151B, §4(4) with 17 U.S.C. §§101 etseq.
Therefore, for the reasons stated above, this Court does not find that the Globe’s ultimatum should be viewed as a violation of the implied covenant of good faith and fair dealing.
2. Bad Faith Modification of a Contract
In the denial of the motion to dismiss, this Court observed that the provision , of the proposed License Agreement that asks freelancers partially to relinquish their copyright in previously published work may be viewed as an attempt by the Globe to modify the oral agreement that governed that published work. All parties agree that, before the license Agreement, when work was submitted by a freelancer, the freelancer retained her copyright and granted permission to the Globe only to publish her work in the Globe newspaper. Through the License Agreement, the Globe seeks to modify this oral agreements by requiring the freelancer, in return for the opportunity to work for the Globe in the future, to grant the Globe permission to publish the earlier works in Boston.com and other online databases.
In the context of commercial transactions under the Uniform Commercial Code, an agreement by the parties to modify or rescind an agreement may be binding without additional consideration. G.L.c. 106, §2-209(1). If this were a commercial transaction under the Uniform Commercial Code (which it is not) rather than an agreement governing the provision of services by an independent contractor, then the modifications set forth in the License Agreement, if executed, would generally be binding even if the continued opportunity to freelance for the Globe were not recognized as additional consideration. However, the Uniform Commercial Code provides an exception to this general rule: the modifications, to be binding, “must meet the test of good faith” imposed by the Code. G.L.c. 106, §2-209, Uniform Commercial Code Comment 2. The Comment provides:
The effective use of bad faith to escape performance on the original contract terms is barred, and the extortion' of a “modification” without legitimate commercial reason is ineffective as a violation of the duty of good faith. Nor can a mere technical consideration support a modification made in bad faith.
The test of “good faith” between merchants or as against merchants includes “observance of reasonable commercial standards of fair dealing in the trade” (Section 2-103) and may in some situations require an objectively demonstrable reason for seeking a modification. But such matters as a market shift which makes performance come to involve a loss may provide such a reason even *407 though there is no such unforeseen difficulty as would make out a legal excuse from performance under Sections 2-615 and 2-616.
G.L.c. 106, §2-209, Uniform Commercial Code Comment 2.
If a merchant’s ability to modify a sales agreement is limited by the test of good faith under the Uniform Commercial Code, it is hardly unreasonable to limit the ability of a merchant to modify an independent contractor’s agreement by that same test under Chapter 93A. The Supreme Judicial Court recently reiterated:
Chapter 93A is “a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights.” Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). The relief available under c. 93A is “sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subj ect to the traditional limitations of preexisting causes of action.” Id. at 704. It “mak[es] conduct unlawful which was not unlawful under the common law or any prior statute.” Commonwealth v. DeCotis, 366 Mass. 234, 244 n. 8 (1974). Thus, a cause of action under c. 93A is “not dependent on traditional tort or contract law concepts for its definitions.” Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 626 (1978).
Kattar v. Demoulas, 433 Mass. at 12-13. Both the Uniform Commercial Code and G.L.c. 93A, § 11 provide remedies, albeit different remedies, for bad faith in the course of business dealings. See id. (foreclosure of a mortgage on an actual default, if motivated by bad faith, may be actionable conduct under G.L.c. 93A, §11 even though evidence of motive is irrelevant to a common-law claim of wrongful foreclosure). This Court finds that the modification or attempted modification of a contract in bad faith among persons engaged in trade or commerce may constitute an unfair act or practice and therefore be actionable under G.L.c. 93A, §11, just as it would be actionable under G.L.c. 106, §2-209 in a commercial transaction.
I concluded in the decision denying the motion to dismiss:
[T]his Court finds that, depending on the circumstances, the modification of a contract may be in bad faith when it is procured through an ultimatum in which a company threatens an independent contractor, even an independent contractor who is terminable at-will, with termination unless that independent contractor agrees to waive any claim to a benefit the independent contractor has earned or is otherwise entitled to receive through its past service on behalf of that company.
Memorandum of Decision and Order on Defendant’s Motion to Dismiss at 13. Now that these circumstances have been presented in the summary judgment record, this Court concludes that this modification was not in bad faith.
As noted earlier, Comment 2 of G.L.c. 106, §2-209 observed that the test of whether a modification was made in “good faith” rests on whether the merchant conformed to “reasonable commercial standards of fair dealing in the trade (Section 2-103) and may in some situations require an obj ectively demonstrable reason for seeking a modification.’’This Courtis satisfied, here, that the Globe had “an objectively demonstrable reason for seeking a modification.” The Globe did not begin to furnish freelance material to Boston.com and other online databases until the District Court in Tasini declared that such republication and redistribution were permissible under the Copyright Act. Essentially, the Globe gambled that the District Court’s decision would hold up on appeal, and it lost that bet. Having lost, it was now faced with the serious problem that it had infringed upon the copyrights of many (maybe most) of its freelancers after the issuance of the District Court’s decision in Tasini, each of whom had the right to seek actual or statutory damages by bringing a claim under 17 U.S.C. §504 for each infringement. The Globe had three alternatives to deal with this problem: (1) it could litigate each infringement claim; (2) it could amicably resolve the potential infringement claims with the freelancers through a monetary settlement; or (3) it could require its freelancers, as a condition of continuing to freelance for the Globe, to grant it a license essentially consenting to the Globe’s prior republication and redistribution of their work. The third alternative, at least in the short run, was the cheapest, and that was the alternative chosen. This third alternative may have also been the -most heavy-handed and the most likely to damage morale and loyalty among its freelancers, but it was chosen for an objectively demonstrable reason and therefore falls within the realm of reasonable commercial standards of fair dealing.
Viewed differently, the concern of the Uniform Commercial Code regarding the modification of contracts focuses on the danger of “extortion of a ‘modification’ without legitimate commercial reason." G.L.c. 106, §2-209, Uniform Commercial Code Comment 2. This Court acknowledges that the Boston Globe newspaper has the largest circulation of any daily newspaper in the region, that there are limited opportunities for freelance writers and photographers to earn a living if they cannot sell their work to the Globe, and that, for those who have done freelance work for the Globe, the loss of this relationship poses a significant blow to their career and financial well-being. This Court also acknowledges that all of these factors gave the Globe substantial leverage in its dealings with freelancers, and that the Globe took advantage of that leverage in requiring its freelancers to surrender part of their copyright in previously published work to preserve their freelance relationship with the Globe. Yet, this Court also finds that the Globe did not demand this modification of the previous oral agreement simply to extract another concession from its freelancers; it demanded this modification to solve a problem that it *408 found itself in when the Second Circuit reversed the District Court’s decision in Tasini. Therefore, even if one were to characterize this modification as “extortion” obtained through the Globe’s strong bargaining position, the legitimate commercial reason for the Globe to have demanded this modification places its demand within the rough and tumble, yet reasonable, commercial standards of fair dealing in the trade.
For all these reasons, this Court finds that the Globe’s ultimatum, if it had been issued in the context of a commercial transaction under the Uniform Commercial Code, would have met the test of good faith imposed by the Code and would not have violated G.L.c. 106, §2-209 of the Code. Having found that the ultimatum neither violated the implied covenant of good faith and fair dealing nor the test of good faith imposed by the Uniform Commercial Code, this Court concludes that the ultimatum was not an unfair act or practice in violation of G.L.c. 93A, §11.
3. Misrepresentation and Duress
In their amended complaint, the plaintiffs allege not only that the ultimatum in the proposed Licensing Agreement was an unfair act or practice in violation of G.L.c. 93A, but also, as to the one plaintiff who executed the License Agreement, Cate McQuaid, that the explanations offered by employees of the Globe regarding the meaning of the terms of the Licensing Agreement constituted misrepresentations that were themselves deceptive acts or practices in violation of G.L.c. 93A. McQuaid also alleges that she executed the License Agreement by duress.
This Court need not dwell long on either of McQuaid’s theories. Her claim of duress is plainly untenable. ‘To avoid a contract on the basis of duress, a party must show that conduct by the other party caused him to enter into the contract ‘under the influence of such fear as precludes him from exercising free will and judgment.’ ” Coveney v. President & Trustees of College of Holy Cross, 388 Mass. 16, 22 (1983), quoting Avallone v. Elizabeth Arden Sales Corp., 344 Mass. 556, 561 (1962). Here, McQuaid does not seek rescission of the License Agreement. Nor does her deposition testimony support the contention that she signed the License Agreement under the influence of such fear as precluded her from exercising free will and judgment. Before McQuaid signed the License Agreement, she attended a meeting of freelancers opposed to it, conferred privately with other freelancers, and discussed the proposed Agreement with family and friends, including her father, who was an attorney. In short, she had a full and fair opportunity to mull over the proposed Agreement and decide whether she was going to sign it. Her claim of duress is really a claim that, financially, she could not risk losing.her freelance relationship with the Globe, which comprised roughly ninety percent of her income. This Court appreciates that the Globe placed McQuaid “between a rock and a hard place” by forcing her to choose between losing the freelance relationship that constituted ninety percent of her income and relinquishing some part of her copyright in work previously published by the Globe, but this difficult choice, as a matter of law, cannot alone support a claim of duress.
As to her claim of misrepresentation, assuming (without deciding) that the evidence in the summary j udgment record supports a finding that the explanatory letters contained misrepresentations, McQuaid has failed to provide any evidence that the alleged misrepresentations caused her damage. Actual reliance on a deceptive statement is not a required element of a G.L.c. 93A claim, but the plaintiff must show “a causal connection between the deception and the loss and that the loss was foreseeable as a result of that deception.” International Fidelity Insurance Co. v. Richard E. Wilson, Sr., 387 Mass. 841, 850 (1983). See also Heller Financial v. Insurance Company of North America, 410 Mass. 400, 409 (1991). Here, there is no causal connection. The only loss that McQuaid articulates is the loss of her license to use and reuse all of the work that she previously published in the Globe. Implicit in this contention of loss is that she regrets having signed the License Agreement, having recognized that the Globe misrepresented the meaning and content of the License Agreement, but the amended complaint does not seek recission of this Agreement. Nor is there anything in her deposition testimony that indicates that there is any causal connection between the alleged misrepresentations and the alleged loss. Rather, she testified that she did not want to sign the Agreement but felt compelled to sign even though she thought it was the wrong thing to do. Her compulsion to sign the Agreement was not caused by any misrepresentation but by the fear of losing the freelance relationship that produced roughly ninety percent of her annual income. In short, there is no evidence that the alleged misrepresentations had anything to do with anything that McQuaid did, so her G.L.c. 93A claim cannot rest on these alleged misrepresentations.
ORDER
For the reasons stated above, the Globe’s motion for summary judgment is ALLOWED.

The Globe also retained the exclusive right to print publication of the freelancers’ work for the first news cycle outside eastern Massachusetts and southern New Hampshire.

Outside eastern Massachusetts and southern New Hampshire, the freelancer could publish his work any time after the first news cycle.

It should be noted that, under Fortune and the line of cases it engendered, the contract damages that may be awarded to an at-will employee for this breach of the implied covenant of good faith and fair dealing are limited to the amount of the commissions he had fairly and legitimately earned. See, e.g., King v. Driscoll, 424 Mass. at 12; Kravetz v. Merchants Distribs., Inc., 387 Mass. 457, 463 (1982). The employee is not entitled to injunctive relief to prevent or rescind the termination, or to damages for lost wages and benefits. King v. Driscoll, 424 Mass. at 12.